UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
ANTHONY JOHN WERGEN,

                    Plaintiff,                    <u>MEMORANDUM & ORDER</u>
                                                   20-CV-3558 (JS)

      -against-

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-------------------------------X
APPEARANCES
For Plaintiff:      Darlene Rosch Esq.
                    Nassau/Suffolk Law services Committee, Inc.
                    1757 Veterans Highway, Suite 50
                    Islandia, New York  11749

For Defendant:      Kristin Everhart, Esq., Special A.U.S.A.
                    United States Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East, 7th Floor
                    Brooklyn, New York  11201


SEYBERT, District Judge:

        Plaintiff Anthony John Wergen ("Plaintiff) brings this
action pursuant to Section 205(g) of the Social Security Act (the
"Act"), 42 U.S.C. § 405(g), challenging the denial of his
application for Social Security Disability benefits under Title II
of the Act and Supplemental Security Income benefits under Title
XVI of the Act by the Commissioner of Social Security (the
"Commissioner"). (See Compl, ECF No. 1.)  Pending before the Court
are the parties' cross-motions for judgment on the pleadings. (See
Pl. Motion, ECF No. 11; Pl. Support Memo, ECF No. 11-1; Comm'r

Cross-Motion, ECF No. 15; Comm'r Support Memo, ECF No. 15-1; Pl. Reply, ECF No. 16; see also Admin. Tr., ECF No. 9.[1])   For the following reasons, Plaintiff's Motion is GRANTED, and the Commissioner's Cross-Motion is DENIED.

<u>BACKGROUND</u>

I.   <u>Procedural History</u>

On December 10, 2016, Plaintiff filed an application for disability insurance benefits alleging his disability, <u>i.e.</u>, a depressive disorder and anxiety disorder, began September 23, 2016. (R. 13, 15.)   He also identified a history of learning disorder, asthma, and human immunodeficiency syndrome ("HIV") (R. 15.)   After Plaintiff's claim was denied, on May 26, 2017, he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 13.)   On January 4, 2019, Plaintiff appeared at a disability hearing before ALJ Paul Greenberg, who presided over the hearing virtually.   Plaintiff was represented by a non-attorney representative, James Denson. (<u>Id.</u>)   Michael C. Dorsey, a Vocation Expert ("VE"), testified at the disability hearing. (<u>Id.</u>)

In a May 13, 2019 decision, the ALJ found Plaintiff was not disabled. (R. 10-23.)   On June 10, 2020, the Social Security Administrative Appeals Council denied Plaintiff's request for

---

[1]  Hereafter, the Court shall cite to the Administrative Transcript as "R" and provide the relevant Bates Stamp number(s).

review, making the ALJ's decision the final decision of the
Commissioner. (R. 1-3.)

Plaintiff initiated this action on August 6, 2020. (See
Compl.)  On May 14, 2021, Plaintiff moved for judgment on the
pleadings.  The Commissioner cross-moved for judgment on the
pleadings on September 10, 2021.  On October 10, 2021, Plaintiff
filed his reply.  The Cross-Motions are ripe for decision.

II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial
evidence and employment history before turning to his medical
records and the VE's testimony.

A.   Testimonial Evidence and Employment History

At the time of the January 4, 2019 disability hearing,
Plaintiff was 25-years-old. (R. 37.)  His highest level of
education is high school. (R. 42.)  Plaintiff testified the last
time he worked was 2015 and he had several different retail jobs.
(R. at 43.)  Plaintiff has never worked full-time. (R. 43.)
Plaintiff attributes his jobs ending to his nerves and his poor
attendance. (R. 44.)  Relatedly, Plaintiff explained that, while
he has since tried interviewing for jobs, he has not secured
employment because of his nerves and issues with being around
people. (R. 45.)  He had also tried vocational training but had
issues persevering with it. (Id.)  Again, he had attendance issues,
which he attributes to his nerves; further, Plaintiff's depression

caused him to be sleepy and not be able to keep up with work. (Id.) Plaintiff further testified that when he tries to leave the house, he ends up having panic attacks and is always in fear. (Id.) Similarly, Plaintiff testified if he were to job search, he would also anticipate having problems with the job, such as not getting along with co-workers or being judged them. (R. 53.) (Id.)

Plaintiff has had HIV for seven years; he receives his HIV treatment from Dr. Rosenthal. (R. 46.)  At the time of his disability hearing, Plaintiff's viral load was undetected. (R. 48.)  Plaintiff testified his HIV has posed issues with his ability to eat and have an appetite. (R. 46.)  In particular: Dr. Rosenthal prescribed Genvoya, which Plaintiff was to take once a day (R. 47); while this medication did not cause Plaintiff to experience side effects, it exacerbated his fear of choking on the pills. (Id.)  Further, due to a prior incident where he thought he was choking while eating, Plaintiff has had a fear of eating food and swallowing properly, believing he will choke. (R. 47.)  In turn, Plaintiff's choking-fear manifested in his not eating. (Id.) Low body weight was an issue for Plaintiff in the four years leading up to the disability hearing (R. 47); his weight fluctuated, ranging from a low of 115 pounds to a high of 130 pounds. (R. 38.)  Indeed, at the time of the disability hearing, Plaintiff weighed 122 pounds. (R. 37).  Plaintiff's fear of choking caused him to inconsistently take his medication. (R. 52.)

Plaintiff's HIV also causes him to always be tired and lack energy. (R. 46, 48.)   As such, for example, Plaintiff testified he had trouble staying focused enough to watch television and showers only once a week. (R. 48.)

Regarding his depression and anxiety, Plaintiff testified he received treatment at Peninsula Counseling, where he was treated by Dr. Cangiano, a medical doctor, and Dr. Miller, a psychiatrist (R. 48-49.)   There, Plaintiff's doctors diagnosed him with major depression and social anxiety. (R. 49.)   He was prescribed 20mg of Paxil and 10mg of Lexapro. (R. 50.)   Plaintiff stated his depression caused him to feel sad, have no interest, and get little sleep. (Id.)

Plaintiff lives with his mother and younger sister. (R. 38.)  While he has a learner's permit, Plaintiff does not have a driver's license. (R. 41.)   Thus, his mother brings Plaintiff to his appointments. (R. 52.)   She also reminds him to shower and take his medication. (Id.)  Aside from his mother and sister, Plaintiff stated he does not get along with people in general. (R. 50.)   He also stated he does not take orders well. (R. 51.) Being around others makes Plaintiff feel as though they are out to get him. (Id.)  Plaintiff testified these feelings and fears caused issues with jobs he has held, e.g., causing him to have poor attendance and, eventually, causing him to stop going to work. (Id.)   In addition, Plaintiff testified that while he does not

physically have trouble walking to the nearby stores in his neighborhood, to do so causes him anxiety because he fears the people he may encounter on the way. (R. 54.)

Plaintiff's poor attendance was also manifest in his attendance of his psychiatric appointments. (R. 51.) Because being in the waiting room with others caused him panic, stress, and anxiety, Plaintiff would often miss appointments. (Id.) Plaintiff further explained that his non-motivation, which was a by-product of his depression, also played a role in his not attending appointments with his doctors. (R. 53.) Relatedly, since making phone calls caused him to be anxious, Plaintiff would not call to cancel doctor appointments. (R. 51.)

B.   Medical Evidence

Plaintiff completed IQ testing in February 2010; his score was 85, which is consistent with low-average intellectual functioning. (Comm'r Support Memo at 4.) On April 21, 2016, Plaintiff saw a primary care physician. (Id.) At that time, he was diagnosed with HIV and mild intermittent asthma without complication. (Id.) A more detailed recitation of Plaintiff's medical history follows.

1.   David Rosenthal, M.D.

On June 23, 2016, David Rosenthal, M.D., completed a questionnaire about Plaintiff's HIV noting Plaintiff did not experience any opportunistic or indicator diseases or other

manifestations of HIV infection such as fever, fatigue, malaise, weight loss, pain or night sweats. (R. 342-43.)  The Doctor also indicated Plaintiff did not have: marked restrictions of activities in daily living; marked difficulties in maintaining social functioning; or marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (Id.)

### 2.   Nurse Practitioner Veronica Ogula

Plaintiff saw Veronica Ogula, PMH-NP (hereafter, "NP Ogula") twice.  On November 12, 2016, NP Ogula completed an assessment for Plaintiff noting Plaintiff had major depressive disorder and generalized anxiety disorder. (R. 308.)  She indicated Plaintiff was moderately limited in his abilities to: understand and remember complex instructions; maintain attention and concentration; and, complete low-stress, simple tasks. (R. 309.) Plaintiff was not limited at: understanding and remembering simple instructions; interacting appropriately with others; maintaining socially appropriate behavior; maintaining hygiene; or using public transportation. (Id.)  Plaintiff was not noted to be very limited in any category. (Id.)  NP Ogula did report that, on occasion, Plaintiff will experience behaviors that interfere with daily living due to his psychiatric condition. (R. 309.)

On March 25, 2017, NP Ogula completed a mental status examination (R. 332-34).  In her findings on initial comprehensive

mental status, she noted Plaintiff was alert and oriented. (Id.)
At the time of assessment, Plaintiff's current symptoms included:
depressed mood; increased sleep; loss of appetite; low energy and
mood; and, low self-esteem. (R. 332.)   Plaintiff also reported
symptoms   of:   racing   thoughts;   no   motivation;   and,   poor
concentration. (Id.)  NP Ogula noted Plaintiff's: speech was clear,
coherent, and spontaneous; mood was neutral; and, affect was
reactive. (Id.)  She found Plaintiff's memory was intact, and he
had  good  ability  to  perform  calculations  and  serial  sevens.
(R. 332-33.)  His insight and judgment were also noted as good.
(R. 333.)  NP Ogula reported as "unknown" Plaintiff's ability to
function in a work setting. (Id.)  In assessing Plaintiff, NP Ogula
opined Plaintiff was limited in the areas of: understanding and
memory;   sustained   concentration   and   persistence;   social
interaction; and, adaptation. (R. 333-34.)  She further explained
Plaintiff was "mostly depressed and amotivated." (R. 334.)

### 3.   Niki Caggiano, D.O.

Plaintiff saw Niki Caggiano, D.O., twice.  He first saw
Dr. Caggiano on March 17, 2017, as a new patient to establish care
and get referrals. (R. 362.)   At that time, the Doctor noted
Plaintiff's  illnesses  included:  HIV;  eating  aversion/decreased
appetite;  depression/anxiety;  allergies/asthma;  and,  fatigue.
(Id.)  Among other things, in her notes, Dr. Caggiano stated
Plaintiff: had a history of depression and anxiety for which he

was taking medication as prescribed by his psychiatrist; had problems with fatigue and sleeping too much; had an aversion to eating and struggled with a decreased appetite; recently lost weight and had a BMI of 17 versus a target range of between 19 to 26; has HIV with a non-detectable viral load; and experienced diarrhea since 2012, but has never been diagnosed with irritable bowel syndrome. (R. 362, 365.)

Upon physical examination of Plaintiff, Dr. Caggiano reported Plaintiff: weighed 127 pounds (R. 364) and was underweight (R. 365); was alert and in no acute distress (R. 364); exhibited normal bowel sounds, normal gait, and intact cranial nerves; and presented with normal affect and mood (id.). Based upon her exam, the Doctor recommended: (1) to address his low weight, Plaintiff (a) drink Ensure three to four times per day (R. 365); and (b) see a gastroenterologist ("GI") and an infectious disease doctor about appetite enhancing medicines including marijuana (id.); and (2) to address his diarrhea, Plaintiff follow a BRAT diet[2] and see a GI. (Id.) Dr. Caggiano noted Plaintiff followed up with a psychiatrist regularly and was taking his medications as directed, which she theorized may be causing his fatigue. (Id.) She suggested he take

---

[2] "BRAT" is an acronym for bananas, rice (or rice cereal), applesauce, and toast. See STEDMAN'S MEDICAL DICTIONARY, App. 15 (28th ed. 2006). A BRAT diet is often recommended for persons suffering from diarrhea. See generally, Dr. Sheila Mackell, "Traveler's Diarrhea in the Pediatric Population: Etiology and Impact", Clinical Infectious Diseases (2005:41:S548-549).

a multivitamin and begin exercising. (Id.)  The Doctor also noted Plaintiff's asthma was asymptomatic, and his lungs were clear. Dr. Caggiano determined Plaintiff needed referrals to a dermatologist, an ophthalmologist, his infectious disease doctor, and a gastroenterologist. (R. 362)

On September 12, 2017, Plaintiff saw Dr. Caggiano for a second, follow-up physical examination. (R. 345-52.)  The Doctor described Plaintiff's health since his last visit as fair. (R. 348.)  According to his BMI number, Plaintiff was still under-weight at that time, with a recent weight gain of one pound only. (R. 348, 350.)  Dr. Caggiano further reported Plaintiff: had stopped his psychiatric medication; had an appointment to see a new psychiatrist; and, was sleeping too much and experiencing fatigue. (R. 348.)

### 4.  Kathleen Acer, Ph.D.

On April 21, 2017, Kathleen Acer, Ph.D., saw Plaintiff for a consultative psychiatric evaluation. (R. 335-39.)  By way of background information, the Doctor reported Plaintiff:  had completed high school, where he attended regular classes; and, his last job was at Marshalls in 2015, which ended due to his severe anxiety. (R. 335.)  Further, Plaintiff started treatment in childhood for ADHD, and was being seen by a psychiatrist twice a month for a year prior, but on April 1, 2017, the psychiatrist discontinued seeing Plaintiff because he was not showing up. (Id.)

He has been prescribed Prozac, mirtazapine, lamotrigine, and clonazepam. (Id.)

Addressing Plaintiff's current functioning levels, Dr. Acer noted Plaintiff: had difficulty falling and staying asleep; stays in bed most days, and will not get up; had recently lost weight; will not shower and does not take care of himself; was apathetic and withdrawn, with no interest or motivation; had trouble focusing and concentrating; and, was socially withdrawn, anxious, nervous, restless, jittery, and tense. (R. 335.) She further reported Plaintiff had panic attacks several times a week that worsen when he left the house and that, during them, he experiences palpitations, sweating, dizziness, difficulty breathing, shaking and trembling. (Id.) The Doctor also noted Plaintiff occasionally believed people were looking at him, following him, and was significantly anxious in social situations. (R. at 336.) Dr. Acer reported Plaintiff had a family history of depression. (Id.)

While cooperative and presenting in an adequate manner, Dr. Acer also found Plaintiff: had tense posture and restless motor behavior; made appropriately focused eye contact; exhibited speech which was monotonous and atonal; and, displayed a coherent, goal directed thought process, with no evidence of hallucinations, delusions, or paranoia. (R. 336.) His mood and affect were depressed and apathetic; he was oriented with adequate attention

and concentration. (Id.)  However, Plaintiff's recent and remote memory skills were impaired, even though his cognitive functioning was average. (R. 337.)

Reporting on his mode of living, Dr. Acer reported: Plaintiff was able to dress, bathe, and groom himself; Plaintiff's cooking, cleaning, laundry, shopping, and money management was performed by his mother; Plaintiff did not drive or take public transportation (with his mother having driven him to the evaluation); and, he did not socialize, but spent his days sleeping. (R. 335, 337.)

In her medical source statement, Dr. Acer opined Plaintiff: had no limitations in his ability to follow and understand simple instructions and directions; may have moderate limitations understanding, remembering, and applying complex instructions and directions; and may experience marked limitations (1) interacting appropriately with supervisors, co-workers, and the public, (2) sustaining attention and concentration, and (3) sustaining an ordinary routine and regulating emotions. (R. 337.)  The Doctor also reported Plaintiff had mild limitations in maintaining hygiene. (Id.)  She stated the results of her evaluation "appear to be consistent with psychiatric issues which hinder functioning." (Id.)

Dr. Acer diagnosed Plaintiff with: major depressive disorder; generalized anxiety disorder; social anxiety disorder;

and panic disorder.  (Id.)  She opined Plaintiff would benefit
from ongoing psychiatric treatment and counseling. (R. 338.)

        5.   K. Gawley, Ph.D.

        Plaintiff's case was reviewed on April 28, 2017 by K.
Gawley, Ph.D., an agency psychological consultant. (R. 65-70.)
The Doctor reported Plaintiff had one or more medically
determinable impairments, further reporting he had severe
depressive and anxiety disorders. (R. 66.)  For both disorders,
Dr. Gawley reported impairments were present but did not satisfy
the "A Criteria". (Id.)  As for "B Criteria", the Doctor noted
Plaintiff's limitations were moderate for his ability to:
understand, remember, or apply information; interact with others;
and, concentrate, persist or maintain pace. (Id.)  His ability to
adapt or manage himself was noted as mild. (Id.)  The evidence
reviewed by Dr. Gawley did not establish the presence of
"C Criteria." (Id.)

        Dr. Gawley reported Plaintiff experienced the following
symptoms: understanding and memory limitations; sustained
concentration and persistence limitations; social interaction
limitations; and, ability to adapt limitations. (R. 67.)  She
opined that one or more of Plaintiff's medically determinable
impairments was reasonably expected to produce pain and other
symptoms. (Id.)  The Doctor noted that between the Plaintiff's
statements about his symptoms and the medical and non-medical

evidence, the information was partially consistent; Plaintiff's statements were credible, but not to the degree alleged. (Id.)

Dr. Gawley performed a mental residual functional capacity assessment of Plaintiff to determine his ability to perform sustained work activities. (R. 67-70.)  In doing so, the Doctor noted Plaintiff had understanding and memory limitations; while Plaintiff's abilities to remember locations and work-like procedures and understand and remember very short and simple instructions were not significantly limited, his ability to understand and remember detailed instructions was moderately limited. (R. 68.)  Further, Dr. Gawley reported Plaintiff had sustained concentration and persistence limitations. (Id.)  In particular, he was moderately limited in his abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; and, be punctual within customary tolerance. (Id.)  Continuing, the Doctor also noted Plaintiff was moderately limited in his ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 68-69.) Conversely, Dr. Gawley concluded Plaintiff was not significantly limited in his abilities to: carry out short and simple instructions; sustain an ordinary routine without special

supervision; work in coordination with or in proximity to others without being distracted by them: and, make simple work-related decisions. (R. 68.)

Dr. Gawley also determined Plaintiff had social interaction limitations. (R. 69.)  She reported Plaintiff was moderately limited in his abilities to: accept instructions and respond appropriately to criticism from supervisors; and, get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.)  However, Plaintiff was not significantly limited in his abilities to: interact appropriately with the public; ask simple questions or request assistance; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.)

Moreover, the Doctor recorded Plaintiff exhibited adaptation limitations. (Id.)  For example, Plaintiff was moderately limited in his abilities to: travel in unfamiliar places or use public transportation; and, set realistic goals or make plans independently of others. (Id.) Yet, Dr. Gawley determined Plaintiff was not significantly limited in his abilities to: respond appropriately to changes in the work setting; and, be aware of normal hazards and take appropriate precautions. (Id.)

6.  Leonard Sarro, LCSW-R

Plaintiff was referred to New Horizon Counseling Center (hereafter, "New Horizon") to provide outpatient treatment

services for depression, anxiety, social relationship issues/isolation, behavior problems, and difficulties with functioning in the community independently. (R. 371.) Plaintiff attended therapy at New Horizon from September 2017 through October 2018; in that timespan, he missed or canceled multiple appointments[3]. (R. 384-436.)

Plaintiff began treatment with Leonard Sarro, LCSW-R,[4] beginning in August 2017, who he saw multiple times. On August 3, 2017, Sarro conducted a mental status examination of Plaintiff. (R. 370-78.) He reported Plaintiff was diagnosed with asthma,

---

[3] Plaintiff cancelled appointment on: September 2, 2017 (R. 434); October 2, 10, & 31, 2017 (R. 427, 429, 430); November 14, 2017 (R. 426); December 9, 2017 (R. 424); February 2, 2018 (R. 420); March 6 & 16, 2018 (R. 411, 413); April 27, 2018 (R. 409): May 4 & 11, 2018 (R. 407-08); June 1, 8, 15 & 29 (R. 400-02, 405); July 13 & 20, 2018 (R. 397-98); August 10, 13 & 31, 2018 (R. 390, 393-94.); September 7, 10, 14 & 28, 2018 (R. 385, 387-89); and, October 5, 2018 (R. 384).

[4]

A Licensed Clinical Social Worker ("LCSW") is a mental health professional who provides counseling, evaluation, intervention, and case management services to those who are suffering mental, social, familial and/or medical issues. . . . A LCSW can work in mental health facilities, social service agencies, hospitals, school systems, or even open their own private practice.

Therapist Development Center: LCSW, available at https://therapistdevelopmentcenter.com/lcsw (last visited August 5, 2024). In New York, the "R" after "LCSW" indicates an LCSW has extensive additional supervised experience compared to those who are merely licensed as mental health professionals.

HIV, scoliosis, and an eating disorder. (R. 375.)  Sarro further reported that, during the intake process, Plaintiff: presented as cooperative; easily engaged with good eye contact; was oriented to time, place, and person and had an alert attention span; had a depressed mood; spoke at a normal rate; was of average intelligence; had intact past and recent memory; and, possessed adequate concentration, judgment and impulse control. (R. 381.) Sarro did not report Plaintiff as presenting any current or past dangerous high-risk thoughts and behaviors. (R. 382.)  His recommendation for Plaintiff was: Supportive Reality Oriented and/or Insight Oriented Therapy once a week; psychopharmacology with medication education; and, symptom management monthly and as needed. (R. 383.)

On September 9, 2017, Plaintiff reported to Sarro having issues with his thoughts and being anxious at his sister's party. (R. 433.)  On September 14, 2017, Plaintiff discussed with Sarro his fear of leaving the house and his current eating habits. (R. 432.)  On September 25, 2017, Sarro created a treatment plan for Plaintiff. (R. 431.)  On October 24, 2017, among other issues, Sarro discussed with Plaintiff the problems Plaintiff faced when applying for jobs. (R. 428.)

On December 2, 2017, Plaintiff returned to therapy reporting to Sarro struggling with anxiety and eating. (R. 425.) Plaintiff was still not eating regularly by his next session on

January 11, 2018. (R. 423.)  On January 18, 2018, Plaintiff reported continued fears of having food get stuck in his throat. (R. 422.)  Sarro provided Plaintiff with strategies for stopping disturbing thoughts. (Id.)

### 7.  J. Singh, M.D.

On December 14, 2017, a New Horizon doctor, board certified psychiatrist Dr. J. Singh, M.D., examined and completed a medical report on Plaintiff. (R. 367-68.)  The Doctor reported Plaintiff: was prescribed Lexapro and Clonazepam for his major depressive disorder, which was recurrent and moderate; was compliant with taking those medications; at six-feet-tall, weighed 115 pounds; and, was functioned normally in his ability to understand, carry out, and remember instructions. (Id.) (R. 367.) Dr. Singh did not report on Plaintiff's exertional functions in his report.  (R. 368.)

### 8.  Courtney Houlihan

On February 8, 2018, Plaintiff had an initial session with a new therapist, Courtney Houlihan, LMSW,[5] of New Horizon

---

[5]  The acronym "LMSW" means "Licensed Master Social Worker".  "The practice of licensed master social work and the use of the title 'Licensed Master Social Worker' and the designation of 'LMSW' or derivatives thereof in New York State requires licensure as a licensed master social worker, unless otherwise exempt under the law."  N.Y.S. Educ. Dep't, Office of the Professions: License Requirements for Licensed Master Social Worker, available at https://www.op.nysed.gov/professions/licensed-master-social-worker/license-requirements (last visited Aug. 6, 2024).

(R. 419.)  During that session, Plaintiff expressed hating the way he felt, i.e., lacking energy and motivation, and not wanting to be losing weight. (Id.)  During a subsequent February 16, 2018 session, Plaintiff and Houlihan discussed Plaintiff's fear of choking;  Plaintiff  stated  he  was  hopeful  his  upcoming gastroenterology  appointment  would  help  him  move  forward  in overcoming his fear of eating. (R. 418.)  At his next appointment on February 23, 2018, Plaintiff reported the gastroenterology appointment went well, and he had an upcoming endoscopy to assess whether he had an existing medical condition preventing him from swallowing. (R. 417.)

On March 23, 2018, Plaintiff reported to Houlihan having positive social interactions over the prior weeks. (R. 413.)  On March 30, 2018, Plaintiff informed Houlihan his endoscopy went well, and he was able to swallow medication and eat cereal. (R. 412.)  Additionally, Plaintiff expressed feeling he was making progress in dealing with his daily anxiety. (Id.)  On April 13, 2018, Plaintiff told Houlihan of a recent death in the family which caused Plaintiff increased stress. (R. 410.)  He also reported not taking his medication regularly. (Id.)

On  July  6,  2018,  Plaintiff  informed  Houlihan  that, despite recent deaths in the family, he continued to attend doctor appointments and reported positive feedback. (R. 399.)  On August 3, 2018, Plaintiff told Houlihan he was eating better, gaining

weight, and taking his HIV medication, but was not taking the medications prescribed to him by New Horizon staff. (R. 395.) On August 17, 2018, Plaintiff reported he was eating and swallowing better and making a more conscious effort to keep his weight above 120 pounds. (R. 392.) At his August 24, 2018 session with Houlihan, Plaintiff expressed frustration with his continued lack of self-confidence and feeling he is always being judged by others. (R. 391.) On September 21, 2018, Plaintiff reported to Houlihan that he was maintaining his weight, but still needed to gain more. (R. 386.) While Houlihan observed Plaintiff had not progressed towards his goals, having been dealing with family stressors, she also stated he continued to express motivation for getting healthier, e.g., increasing his food intake, and working to identify possible job opportunities. (Id.)

C.  The VE's Testimony

At Plaintiff's disability hearing, the VE was asked to consider a hypothetical individual with Plaintiff's age, educational experience, and work history who could perform light-type work. (R. 55.) The ALJ instructed the VE that this hypothetical individual had mental health limitations and could perform simple, routine tasks but could not perform work in a fast-paced production environment. (Id.) Additionally, this hypothetical individual could have frequent interactions with supervisors, occasional interaction with coworkers, and no

interaction with the public. (Id.)  The VE testified such an individual would be able to perform work as a garment sorter or a mail clerk. (Id.)

When next asked to consider that the hypothetical individual would be off task for one hour per day due to mental health issues, the VE testified the hypothetical individual would not be able to maintain full-time employment. (R. 56.)  When asked to consider that the same hypothetical individual would be absent from work two days per month on a recurring basis, the VE testified that individual would not be able to sustain employment in the VE-identified jobs or any other jobs that exist in significant numbers at any exertional level. (R. 56, 57.)

The VE was then asked to consider what sedentary-type jobs a hypothetical individual could perform if capable of performing only sedentary-type work rather than light-type work. (R. 58.)  The VE testified such hypothetical individual could work as a document preparer, a lens inserter, or a final assembler. (Id.)  Further, Plaintiff's representative, Denson, asked the VE to consider such hypothetical sedentary-work-only individual with the added hypothetical fact that said individual would be absent from work two days per month on a recurring basis and whether such an individual could sustain competitive employment. (R. 59.)  The ALJ interjected, restating a prior answer from the VE that such

hypothetical individual could not sustain competitive employment. (Id.)

                              DISCUSSION

I.   Standard of Review

            When reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)). District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence. Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)). "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

II.  The ALJ's Decision and the Five-Step Disability Analysis

            First, the ALJ found Plaintiff meets the insured status requirements through September 30, 2017. (R. at 15.) The ALJ then applied the five-step disability analysis and concluded Plaintiff was not disabled from September 23, 2016, the alleged onset date,

through May 13, 2019, the date of the decision. (R. 13-23); <u>see</u> 20 C.F.R. § 404.1520.

At <u>step one</u>, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 15.)

At <u>step two</u>, the ALJ determined Plaintiff's diagnosis of depressive disorder and anxiety disorder constituted severe impairments. (<u>Id.</u>). The ALJ stated that, while the record reflected other medically determinable impairments, including a history of learning disorder, asthma, and HIV, these other impairments were non-severe. (R. 15-16.) As to Plaintiff's learning disorder: The ALJ stated Plaintiff's academic performance improved over time; he was also able to read, write, and perform simple calculations; and, there were no signs of more serious cognitive dysfunction. (R. 16.) As for Plaintiff's asthma and HIV: Both were mostly asymptomatic. (<u>Id.</u>) Based upon the medical record, the ALJ found "the nonsevere impairments were responsive to treatment or cause no more than minimal vocationally relevant limitations". (<u>Id.</u>)

At <u>step three</u>, the ALJ determined Plaintiff's impairments did not meet or medically equal the severity of any impairments in Appendix 1 of the Social Security regulations. (<u>Id.</u>) He considered four broad functional areas, known as "paragraph B criteria." (<u>Id.</u>) The ALJ found Plaintiff's mental impairments

were not severe because they did not result in at least one extreme or two marked limitations in: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) managing himself. (R. 16-18.)  The ALJ first examined Plaintiff's abilities for understanding, remembering, or applying information. (R. 16.)  After looking at Plaintiff's IQ testing and recent mental status examinations, the ALJ determined Plaintiff had mild limitation in this area. (R. 16-17.)  Plaintiff's IQ testing, performed while he was in high school, demonstrated his working memory and processing speed were within the average range. (R. 16.)  Further, Plaintiff's mental examinations showed he exhibited average cognitive and memory function and could perform simple calculations. (Id.)

The ALJ found Plaintiff had a moderate limitation in his ability to interact with others because, while he testified about his fear of interacting with people, Plaintiff frequently worked in the retail industry thereby suggests at least partial abilities to interact with people. (R. 17.)  Additionally, although Plaintiff displayed a depressed mood and apathetic affect during his psychological consultative examination, he displayed an appropriate affect and euthymic mood less than a month after starting mental health treatment. (Id.)  Moreover, since receiving some mental health treatment, Plaintiff's moods were somewhat

stable, showing Plaintiff was responding to treatment and suggesting his limitations were only moderate as to interacting with others. (Id.)

The ALJ further determined Plaintiff was moderately limited regarding concentration, persistence, and maintenance-of-pace. (Id.) Although Plaintiff exhibited past difficulties concentrating and maintaining attention, he could count, perform simple calculations, execute serial threes, and respond to questions in mental status examinations and at his disability hearing. (Id.) And, even though Plaintiff had previously reported poor concentration and social anxiety, the ALJ found examination notes by his health care providers did not corroborate Plaintiff's allegations. (Id.)

Continuing, the ALJ found Plaintiff was moderately limited in adapting or managing himself. (Id.) This determination was based upon the ALJ's review of treatment and evaluation records showing Plaintiff: presents as well-groomed; was able to independently bathe, groom, and dress himself; had a driving learner's permit; could use public transportation; but, did not cook, clean, do laundry, shop, or handle money. (Id.) The ALJ also highlighted Plaintiff frequently failed to appear for his mental health treatment appointments. (Id.) The ALJ concluded, while Plaintiff appeared to have difficulties performing many self-care activities on a sustained basis, he was not so limited

that he could not perform some personal grooming tasks, work occasionally, and use transportation. (Id.)  At bottom, the ALJ found Plaintiff did not satisfy the "paragraph B" criteria.  (Id.)

Nor did the ALJ find Plaintiff able to meet the "paragraph C" criteria. (R. 18.)  Of import:  The ALJ acknowledged "it is somewhat unclear whether [Plaintiff] may demonstrate a minimal capacity to adapt to changes in the environment or to demands not already a part of daily life, because [Plaintiff]'s treatment notes are scant and make such an assessment difficult." (Id.)  Further, he recognized Plaintiff's work history was limited and that Plaintiff's testimony indicated underlying mental health issues may be the reason for his short employment stints.  (Id.) Yet, because he was able to go to the DMV to obtain a learner's permit, with very limited and routine mental health treatment, the ALJ concluded, without other evidence to the contrary, there was nothing indicating Plaintiff's capacity to adapt to changes was limited.  (Id.)  And, significantly, the ALJ highlighted that "[w]ith better-developed treatment records, an argument for listing-level severity based on the paragraph C criteria may be possible."  (Id.)  However, such a finding was not supported by the then-current medical evidence. (Id.)

At step four, the ALJ determined Plaintiff had the residual functional capacity ("RFC"):

> to perform a full range of work at all
> exertional levels, but with the following
> nonexertional limitations: [Plaintiff] can
> perform work involving simple, routine tasks.
> He cannot work in a fast-paced production
> environment. [Plaintiff] can have frequent
> interaction with supervisors as part of a job,
> occasional interaction with co-workers, and no
> interaction with the public.

(Id.); see also 20 CFR § 404.1529. To support his RFC determination, the ALJ considered Plaintiff's disability report: he alleged an inability to work due to depressive and anxiety disorders; he had trouble being around people, becoming overwhelmed when in such situations; and, he described episodes of shortness of breath and shaking when feeling panicked in public and around strangers. (Id.) The ALJ reported that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity of his symptoms were not consistent with medical evidence. (Id.)

The ALJ contrasted Plaintiff's alleged September 2016 onset date with the fact that Plaintiff's treatment records did not begin until January 2017. (Id.) He then proceeded to summarize the Plaintiff's medical records from his primary care provider from March and September 2017. (Id.) Pursuant to the records, Plaintiff presented as oriented with a normal mood and affect; Plaintiff also denied experiencing depressive symptoms. (Id.) A March 2017 evaluation noted Plaintiff reported he had a "history

of anxiety and depression" and that he was taking medication prescribed by his psychiatrist. (Id.)

The ALJ then examined medical records authored by Dr. Acer, which included Plaintiff's reported moods, behavior, posture, eye contact, speech, and diagnosis. (R. 19-20.)  The ALJ also summarized Plaintiff's medical records from New Horizon, which, similarly included notations regarding Plaintiff's appearance, eye contact, thought process, mood, attention, and diagnosis. (Id.)  The ALJ noted Plaintiff's treatment records evidenced many instances when Plaintiff was a "no-show." (Id.)  He calculated that, during the two years of treatment at New Horizon, Plaintiff's appointment attendance was less than once a month. (Id.)

The ALJ assigned partial weight to Dr. Acer's opinion. (Id.)  He found Dr. Acer's diagnosis of depression and anxiety disorder were consistent with reports from Plaintiff's treating providers; however, the ALJ was unpersuaded by Dr. Acer's assessment of marked limitations, finding the Doctor's limitations assessment more severe than those of Plaintiff's other treating providers. (Id.)  The ALJ's discounted weight assignment was based upon Dr. Acer's single examination of Plaintiff versus those of Plaintiff's treating providers who met with Plaintiff more often and over extended time periods. (Id.)  Indeed, the ALJ determined the reports from Plaintiff's treating providers supported no more

than finding moderate-level severity in the functional domains. (R. 21.)

Conversely, the ALJ assigned substantial weight to NP Ogula's assessment, who was not a psychologist or medical doctor but who had an ongoing relationship with Plaintiff. (Id.)  The ALJ relied upon NP Ogula's opinion that Plaintiff had difficulty maintaining a schedule and engaging in personal interactions but, according to the ALJ, observed "that [Plaintiff] particularly ha[d] a problem with lack of motivation."  (Id.)

The ALJ gave no weight to Dr. Singh's opinion. (Id.)  He noted although a treating provider, Dr. Singh's report provided "almost no useful functional information other than to list [Plaintiff's] depression diagnosis and check the box that [Plaintiff] does not have problems understanding, remembering, or carrying out instructions." (Id.)  In sum, the ALJ concluded his RFC assessment was "supported by minimal treatment records, inconsistent or sporadic attendance at treatment, mild-to-moderate clinical signs in mental status examinations, and a generally conservative treatment regimen." (Id.)

Finally, at step five, the ALJ determined Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy, as described by the VE during Plaintiff's disability hearing. (R. 22.)  Thus, based upon the VE's testimony and Plaintiff's RFC, age, education, and

work experience, the ALJ determined Plaintiff was not disabled. (R. 22-23.)

III. <u>Analysis</u>

Plaintiff advances two arguments on appeal: (1) the ALJ erred by presenting an improper hypothetical question to the vocational expert (Pl. Support Memo at 6); and (2) the ALJ applied the incorrect legal standard regarding his evaluation of Plaintiff's RFC, resulting in a determination not supported by substantial evidence. (<u>Id.</u>) However, it is necessary for the Court to first consider the record before it.

A. <u>The ALJ's Duty to Develop the Record</u>

It is well-established:

Social Security proceedings are non-adversarial and the ALJ is obliged "to investigate the facts and develop the arguments both for and against granting benefits." <u>Sims v. Apfel</u>, 530 U.S. 103, 111, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (citation omitted). This obligation applies even if the claimant is represented by counsel. <u>See, e.g.</u>, <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). The ALJ's duty to develop the record has been described as a "bedrock principle of Social Security law." <u>Batista v. Barnhart</u>, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (citing <u>Brown v. Apfel</u>, 174 F.3d 59 (2d Cir. 1999)).

<u>Michelle C. v. Comm'r of Soc. Sec.</u>, No. 23-CV-7144, 2024 WL 1706000, at *5 (S.D.N.Y. Apr. 3, 2024), <u>report and recommendation adopted</u>, 2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024). Moreover, it

has been "consistently recognized that 'an ALJ has a heightened duty to develop the record when a claimant asserts a mental impairment.'"   Id. at *6 (quoting Gabrielsen v. Colvin, No. 12-CV-5694, 2015 WL 4597548, at *4-5 (S.D.N.Y. July 30, 2015) (collecting cases)).   Indeed, "[t]his 'heightened duty' derives from the fact that a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating a more thorough review."   Id. (quoting Piscope v. Colvin, 201 F. Supp. 3d 456, 462-63 (S.D.N.Y. 2016)).   In that vein, "[t]he duty to develop the record . . . includes the duty to re-contact physicians when needed to afford the claimant a full and fair hearing based on an adequately developed record."   Id.

"Whether the ALJ has satisfied this duty to develop the record is a threshold question.   Before determining whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ . . . completely developed the administrative record."   Campbell v. Comm'r of Soc. Sec., No. 19-CV-4516, 2020 WL 4581776, at *14 (S.D.N.Y. Aug. 10, 2020); see also Telesco v. Comm'r of Soc. Sec., 577 F. Supp. 3d 336, 353 (S.D.N.Y. 2021) (finding, even though claimant did not challenge sufficiency of the record, ALJ erred by failing to adequately develop the record); Berte v. Comm'r of Soc. Sec., No. 20-CV-2889, 2023 WL 2760515, *3 (E.D.N.Y. Apr. 3, 2023)

(remanding case where ALJ based his non-disability determination on deficiencies in claimant's medical records because ALJ failed to develop said record) (collecting cases); Sanchez v. Saul, No. 18-CV-12102, 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13, 2020) ("As a threshold matter, and regardless of the fact that Plaintiff did not raise an express challenge to the adequacy of the Record, this Court must independently consider the question of whether the ALJ failed to satisfy his duty to develop the Record."), report and recommendation adopted, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020).  "Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings." Diano v. Comm'r of Soc. Sec., No. 19-CV-2265, 2020 WL 13555076, at *16 (citing Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999) (finding remand "particularly appropriate" where ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors)) (collecting cases).

Here, the Court is not satisfied the ALJ completely developed the administrative record.  The following instances highlight example problems with said record.  As to the paragraph C criteria:  While stating the evidence failed to establish such criteria, the ALJ continued, "admit[ing][] it is somewhat unclear whether the claimant may demonstrate a minimal capacity to adapt to changes in the environment or to demands not already a part of

daily life, <u>because the claimant's treatment notes are scant and make such an assessment difficult</u>."   (R. 18 (emphasis added).) Further, the ALJ recognized Plaintiff's work history was limited, which may be attributable to his "underlying mental health issues" and, that "<u>[w]ith better-developed treatment records</u>" Plaintiff could demonstrate a minimal capacity to adapt to change or to demands not already part of his daily life, which could possibly support the satisfaction of paragraph C criteria, but "<u>such a finding [wa]s not supported by the current medical evidence</u>." (<u>Id.</u> (emphasis added).)   Under such circumstances, though, the ALJ was obligated to take steps to further develop the record.   <u>See, e.g.</u>, <u>Berte</u>, 2023 WL 2760515, *3 ("Since [the] ALJ . . . relied on the lack of diagnostic testing in Plaintiff's medical records to find her not disabled, he should have more fully developed the record with respect to the diagnostic tests listed in Plaintiff's medical records.").

        <u>As to the ALJ's RFC determination</u>:   The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", but his statements regarding their "intensity, persistence[,] and limiting effects . . . [we]re not entirely consistent with the medical evidence and other evidence in the record," notwithstanding noting said "<u>medical evidence relating to [his] mental health conditions [wa]s limited</u>." (R. 19 (emphasis added).)   More specifically, regarding

Page 33 of 44

Plaintiff's reporting he "had been seeing a psychiatrist twice a month for the past year, up until April 1, 2017," the ALJ parenthetically noted "(this is not confirmed in the treatment records)". (R. 19-20 (emphasis added).) Nor does it appear that he pursued means to confirm same. In any event, the record also included evidence that Plaintiff engaged in mental health counseling later in 2017 and during 2018. (See, e.g., infra (discussion as to LMSW Houlihan).)

As to Dr. Singh's Report: The ALJ gave no weight to treating provider Dr. Singh's opinion, because that Doctor's report "provide[d] almost no useful functional information other than to list [Plaintiff]'s depression diagnosis and check the box that [Plaintiff] d[id] not have problems understanding, remembering, or carrying out instructions." (R. 21.) Yet, there is no indication the ALJ made efforts to obtain additional documents from this treating provider which could assist in evaluating Plaintiff's ability to function in the workplace, especially considering Plaintiff's history of retaining jobs for short periods in conjunction with his persistently missing counseling appointments. See, e.g., Diano, 2020 WL 13555076, at *16 (stating ALJ's "duty to develop [the record] 'includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC'" (quoting Sigmen v. Colvin, No. 13-CV-0268, 2015 WL 251768, at *11 (E.D.N.Y. Jan. 20,

2015); further citation omitted)); see also Khan v. Comm'r of Soc. Sec., No. 14-CV-4260, 2015 WL 5774828, at *15 (E.D.N.Y. Sept. 30, 2015) (finding ALJ "ignored his affirmative duty to develop the record" by rejecting opinions of treating sources "for lack of documentary support").

As to LMSW Houlihan: The ALJ failed to consider, let alone mention, the treatment reports or opinion of Plaintiff's counselor, LMSW Houlihan. Yet, LMSW Houlihan met with Plaintiff approximately a dozen times in 2018. At a minimum, therefore, it is presumed Houlihan could address Plaintiff's purported poor attendance of scheduled appointments, especially as the ALJ made much of same in his decision. (See R. 20 ("In 2018, this pattern of no-shows only worsened.").) LMSW Houlihan may also be able to provide insight into the ALJ's concern that "[t]here did not appear to be discussion of increasing or adjusting [Plaintiff]'s medications." (Id.) However, in the absence of any mention of LMSW Houlihan, it is woefully unclear whether the ALJ even considered her opinion.

As to mischaracterization of evidence: Relatedly, the Court notes the ALJ somewhat mischaracterized relevant evidence. Indeed, while he assigned "substantial weight to assessments" of NP Ogula, who opined Plaintiff "would have difficultly maintaining a schedule and engaging in personal interactions," the ALJ appears to discount that portion of NP Ogula's assessment because of her

purported observation that Plaintiff "has a problem with lack of motivation." (R. 21 (citing NP Ogula'a Mar. 25, 2017 Evaluation, "Ex. No. 4F")).) Not quite so. It is true Plaintiff self-reported a lack of motivation, which he also testified as probably being a by-product of his depression. But, in indicating Plaintiff had limited adaption abilities when it came to his ability to engage in work-related mental activities, NP Ogula observed "Plaintiff is mostly depressed and amotivated." (R. 334.) In context, "amotivation" appears to be a type of chronic psychiatric disorder, related to depression. Yet, there is no indication the ALJ probed further into NP Ogula's limitation determination based upon Plaintiff's amotivation.[6] Again, the duty to do so is the ALJ's.

Another example of mischaracterization of the evidence is the ALJ's statement that Plaintiff "is able to perform personal grooming tasks independently." (R. 19.) Again, this Court is unconvinced. At the disability hearing, Plaintiff testified that he might "shower once a week" (R. 48) and that his mother has to remind him to do so, although, even then, he may not shower (R. 52). Similarly, Plaintiff's mother reminds him to take his

---

[6] As to Plaintiff's ability to engage in work-related mental activities, NP Ogula also opined Plaintiff was limited in his understanding and memory based upon his diagnoses of major depressive disorder and generalized anxiety disorder, and related symptoms, as well as being limited in the areas of sustained concentration, and persistence and social interactions. (See id. at 333.)

medication, which—even with her reminders—he may not take.  (Id.)
The ALJ's decision fails to reconcile these inconsistencies, which
is problematic, especially given the ALJ's findings that
Plaintiff's treatment was "relatively" and "generally
conservative".  (R. 20-21.)

Hence, upon review of the record presented, the Court
finds the ALJ's failure to adequately develop the record provides
an independent basis for vacating his decision and remanding this
case back to the Commissioner for further findings.  See Rosa, 168
F.3d at 83; see also Diano, 2020 WL 13555076, at * 16 (same, citing
Rosa).

   B.   Improper Questioning of the VE and Ignoring VE Testimony

The ALJ's improper questioning of the VE is also grounds
for remanding this case.  "Work at the light exertional level is
limited to people who can lift and carry 20 pounds occasionally,
and 10 pounds frequently; stand or walk approximately six hours in
an eight hour workday, and sit approximately six hours in an eight
hour workday." 20 C.F.R. § 416.967(b).  Here, after questioning
the VE about a hypothetical individual of the same age, educational
experience, and work history as Plaintiff, the ALJ asked the VE to
assume a hypothetical individual who "can perform light-type
work." (R. 55.)  In doing so, the ALJ committed reversible error.
See Gonzalez v. Comm'r of Soc. Sec., No. 19-CV-2848, 2020 WL
6136201, at *7 (E.D.N.Y. Oct. 19, 2020); see also Johnson v. Comm'r

of Soc. Sec., No. 19-CV-1576, 2021 WL 308284, *6 (E.D.N.Y. Jan. 29, 2021) ("The court . . . cannot find that the vocational expert's testimony provided substantial support for the ultimate conclusion that plaintiff could perform certain kinds of work, because it was based on a hypothetical premised on the unsupported assumption that plaintiff could perform 'medium, light, or sedentary work.'"); Ash v. Sullivan, 748 F. Supp. 804, 809 (8th Cir. 1990) ("A hypothetical question in which the ALJ assumes the [plaintiff] can perform light or sedentary work 'not only begs the question, it ignores the whole purpose of vocational expert testimony, which is to assess whether jobs exist for a person with the [plaintiff's] precise disabilities.'" (quoting Gilliam v. Califano, 620 F.2d 691, 694 n.1 (8th Cir. 1980))). With his presumptions, the ALJ drew a conclusion about Plaintiff's RFC before hearing the VE's testimony, i.e., the light-work-limitation was the starting point without outlining exertional and non-exertional limitations for the hypothetical individual.

Moreover, when the ALJ questioned the VE about the subject hypothetical individual, he posed two additional scenarios for the VE's consideration: (1) where the hypothetical individual would be off-task "for one hour per day in addition to regularly scheduled meals and breaks", would said individual be able to sustain employment in the VE's identified jobs; and (2) where the hypothetical individual would be "absent from work two days per

month on a recurring basis," would said individual be able to sustain employment in the VE's identified jobs? (R. 56.) To both inquires, the VE testified in the negative. (Id. at 56-57.) Yet, in his determination that Plaintiff was not disabled, the ALJ glaringly failed to take this testimony into consideration. (R. 22.) Indeed, he did not even provide the required explanation for his decision to ignore this portion of the VE's testimony, which requires remand for the ALJ to do so. See Karle v. Colvin, No. 12-CV-3933, 2013 WL 4779037, at *3 (S.D.N.Y. Sept. 6, 2013) (remanding case where ALJ ignored VE's testimony that it would be difficult to find employment for hypothetical individual who would be excessively off task); see also Karle v. Astrue, No. 12-CV-3933, 2013 WL 2158474, *18 (S.D.N.Y. May 17, 2013) (recommending case be remanded because, inter alia, ALJ failed to provide required explanation for his decision to ignore VE's testimony regarding hypothetical individual who would require time off task, thereby making it difficult to find said individual employment) (collecting cases).

C.   Unsupported RFC Finding

The ALJ found Plaintiff retained the RFC to perform a full range of work at all exertional levels, with the additional limitations that Plaintiff: (1) perform work involving simple, routine tasks; (2) not be subject to work in a fast-paced production environment; (3) have frequent interaction with

supervisors as part of a job, and only occasional interaction with co-workers; and (4) have no interaction with the public. (R. 18.) The ALJ purported to base his RFC finding upon medical records documenting Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence. (Id.)  Plaintiff challenges the ALJ's RFC determination as not being supported by substantial evidence because the ALJ failed to: (1) include limitations related to fatigue and diarrhea; and (2) explain why he ruled these ailments did not cause limitations. (Pl. Support Memo at 10).  The Court agrees.

When making an RFC determination, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Mancuso v. Comm'r of Soc. Sec., No. 14-CV-0114, 2015 WL 1469664, at *24 (E.D.N.Y. Mar. 30, 2015). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." Id. at *24. The Second Circuit has held "remand may be appropriate" where "an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where

other inadequacies in the ALJ's analysis frustrate meaningful review." Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).

Here, remand is appropriate since the ALJ's RFC determination is not supported by substantial evidence given he did not address all of Plaintiff's relevant ailments and limitations. For example, while the ALJ found little evidence of limitations due to HIV, evidence relating to Plaintiff's fatigue and diarrhea due to his HIV, and which caused limitations, are well-documented. (R. 345, 348, 359, 362.) Relatedly, the record supports a finding that due to these symptoms, Plaintiff would be off-task more than the time allotted for regular rest periods and lunch breaks. (Id.; see also supra (discussing VE's testimony regarding hypothetical individual being off-task and, therefore, being unable to secure employment).) Notwithstanding such record evidence, the ALJ also did not explain how Plaintiff's documented failures at maintaining employment on a consistent basis and his failures in consistently attending appointments with his mental health providers would not interfere with Plaintiff being able to meet the demands of the jobs identified by the VE. However, it is his burden to do so. See Lockwood v. Comm'r of Soc. Sec., 914 F.3d 87, 93 (2d Cir. 2019).

Further, subjective complaints of limitations by claimants are "an important element in the adjudication of [social security] claims and must be thoroughly considered in calculating

the [RFC]." Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); see also 20 C.F.R. § 416.929.  In that regard, ALJs are not required to accept complaints without question, but "may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record." Genier v. Astrue, 606 F.3d 46, 40 (2d Cir. 2010).  In the instant case, the ALJ discounted Plaintiff's credibility by disregarding the well-documented evidence of Plaintiff's inability to maintain employment,[7] including his testimony this was due to his "nerves". (R. 44-45.) In doing so, however, the ALJ "must explain the decision to reject a claimant's testimony 'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether [the ALJ's] decision is supported by substantial evidence." Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010); cf., Michelle C., 2024 WL 1706000, at *6 ("The Commissioner's regulations recognize that a claimant's 'ability to complete tasks in settings that are highly structured, or that are less demanding or more supportive than typical work settings does not necessarily demonstrate [his] ability to complete tasks in the context of regular employment

---

[7]   The record reflects Plaintiff has significant difficult sustaining ordinary routines and regular attendance at work. (R. 315, 384, 385, 387, 388, 389, 390, 393, 394, 396, 397, 398, 400, 401, 402, 403, 405, 407, 408, 409, 414, 415, 416, 420, 424, 426, 427, 429, 430, 434.)

during a normal workday or work week.'" (quoting 20 C.F.R. Subpt. P, App. 1 § 12.00(C)(6)(b))), and at *7 ("Moreover, 'a person can have a condition that is both "stable" and disabling at the same time.'" (quoting Velasquez v. Kijakazi, No. 19-CV-9303, 2021 WL 4392986, at *28 (S.D.N.Y. Sept. 24, 2021))). Given the record evidence, the Court is unpersuaded there were legitimate reasons for the ALJ's disbelief. Moreover, at best it is questionable whether the evidence, given the issues earlier identified by the Court (see supra), supports the ALJ's determination of non-disability. Cf. Michelle C., 2024 WL 1706000, at *7 ("In the present case, although the record contains evidence of periodic progress and relatively stable symptomology with medication and treatment, it likewise documents persistent, severe symptoms (including severe depression, panic attacks, mood problems, and suicidal ideations) . . . ."); Collins v. Berryhill, No. 16-CV-6673, 2018 WL 259282, *8 (E.D.N.Y. Jan. 2, 2018) ("While Plaintiff did state on some occasions that Klonopin made him feel better, there is no medical basis for the ALJ's conclusion that medication sufficiently manages Plaintiff's PTSD and anxiety to a degree where he can perform work-related functions."). As the Second Circuit instructs, in such circumstances, "[r]emand may be appropriate . . . where . . . inadequacies in the ALJ's analysis frustrate meaningful review." Cichocki, 729 F.3d at 177.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 11) is GRANTED, and the Commissioner's Motion (ECF No. 15) is DENIED.  This matter is REMANDED for proceedings consistent with this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and, thereafter, mark this case CLOSED.

**SO ORDERED.**

  /s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September 5, 2024
           Central Islip, New York